2011 ME 28

**STATE of Maine**

v.

**Eric A. ERICSON.**

Supreme Judicial Court of Maine.

Submitted on Briefs: Dec. 1, 2010.
Decided: March 3, 2011.

Jeffrey M. Silverstein, Esq., Bangor, ME, for Eric Ericson.

Neale T. Adams, District Attorney, Todd R. Collins, Asst. Dist. Atty., Caribou, ME, for the State of Maine.

Panel: SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, and JABAR, JJ.

JABAR, J.

[¶ 1] Eric Ericson challenges three separate rulings issued by the Superior Court (Aroostook County, *Cuddy, J.*) during the course of his trial, each of which limited the evidence he was able to present in his defense. He contends that the court erred in excluding the testimony of his expert witness, in determining that he had waived his right to testify, and in limiting the scope of his cross-examination of the victim. Finding no error or abuse of discretion in the trial court's actions, we affirm the judgment.

## I. BACKGROUND

[¶ 2] In April 2010, a jury convicted Eric Ericson of gross sexual assault (Class A), 17–A M.R.S. § 253(1)(B) (2010), unlawful sexual contact (Class C), 17–A M.R.S. § 255–A(1)(E) (2010), and sexual abuse of a minor (Class C), 17–A M.R.S. § 254(1)(A–2) (2010). These convictions were supported by the testimony of the victim and her mother,[1] Ericson's former girlfriend. They described the terms of a "game" that began when Ericson came to live with them in 2002, when the victim was around eleven years old. In this "game," Ericson would complete household chores upon the order of the victim or her mother in exchange for sexual gratification. The victim's mother recalled Ericson rubbing his penis against the victim's stomach and genitals on two separate occasions.[2] The victim testified that Ericson sexually abused her on a regular basis throughout the period that he lived at her mother's home.

[¶ 3] Both witnesses also testified that Ericson and the victim's mother quarreled over parenting practices, which eventually created a dysfunctional home environment. Ericson based his defense on the theory that the victim fabricated the allegations of sexual abuse because she wanted to be removed from the tension-filled home she shared with Ericson and her mother. He further theorized that, now that the victim had been removed from the home and placed with a foster family, she refused to admit to her lies because she preferred living with the foster family to her own family.

[¶ 4] To support his theory, Ericson elicited testimony from the victim that her foster home was a supportive and fun environment, and she wanted to remain there. Ericson's cross-examination then turned toward a conversation in which the victim allegedly told her foster mother that she should not be transferred from the foster home to her father's home because he used to tie her by her wrists to a pole in the basement. The State objected and, to preserve the issue, Ericson made the following offer of proof:

> [Rule] 608 allows inquiry into specific instances that are probative of truthfulness and untruthfulness. And this witness made a particular allegation that is fantastic in nature—that would be denied by [the father]—that she was tied around the wrists around a pole ... in the basement. And if the motive was so she would not be placed elsewhere and

---

1. The victim was adopted by her mother and father after she came to live with them at six months of age. The mother and father subsequently divorced, and the victim went to live with her mother shortly before Ericson arrived.

2. The mother also testified that she has "a tendency to block memories of a lot of things."

to stay in the [foster home], [that] is the same motive we allege . . . is the reason why she continues with these allegations as part of the defense's theory.

The court excluded this evidence, finding that it addressed a collateral matter and that Ericson had already exposed the victim's preference for her foster home.

[¶ 5] Ericson testified in his own defense. In response to a question asking him to explain his earlier statement that "[the victim] was manipulative," Ericson injected inadmissible evidence into his testimony.[3] The State objected to Ericson's answer, and the court sustained the objection, but Ericson continued to describe the inadmissible evidence over the court's and the court officer's orders that he stop. He also informed the jury, "[T]hey won't show you all sorts of things. It's a censored court. It's not an open court." The court then excused the jury.

[¶ 6] The court addressed Ericson and told him that he would need to control himself and testify in a manner that was consistent with the court's direction. When asked if he understood the court's instruction, Ericson expressed that he understood the words but did not agree with the rules. In chambers, the court requested that Ericson's attorney meet with Ericson to learn whether Ericson could control himself if he resumed testifying. The court stated: "[I]f [Ericson] is not prepared to represent that [he can control himself] . . . then I'm in a position of deciding whether or not to treat him as having waived his right to testify by his conduct." Ericson's attorney reported back to the court that Ericson "believe[d] in an open court," and that he intended to be honest and truthful.

[¶ 7] Still seeking assurance from Ericson that he would comply with evidentiary and procedural rules, the court questioned Ericson on the record about whether he understood that there would be limitations on his testimony. The court informed him that the "right to testify carries with it a responsibility . . . that involves your complying with my directions." When asked if he understood, Ericson responded, "No." The court twice more asked Ericson if he was prepared to follow the court's directions, and when Ericson failed to acknowledge that he would, the court concluded that Ericson had waived his right to testify.

[¶ 8] As his final witness, Ericson offered the deposition testimony of Dr. Joseph Plaud, a licensed clinical psychologist who evaluates accused and convicted sex offenders. Plaud evaluated Ericson's "psychological and psychosexual interest patterns and behavior" through a battery of tests, including the Abel Assessment for Sexual Interest. The Abel Assessment comprises two parts. One part measures and records the length of time that the test taker views slides of different types of sexual behavior and of partially clothed males and females of various ages, premised on the belief that there is a correlation between sexual interest and the length of time spent viewing the sexual stimuli. The other part is a questionnaire in which the test taker reports his level of attraction to each image. The data collected is transmitted to a research team that uses formulas to generate a graph of sexual interest patterns. Based in part on the results of the Abel Assessment, Plaud concluded that Ericson did not have "deviant sexual preferences," meaning that he did not show a sexual interest in children or violence.

---

**3.** Ericson was testifying to the contents of Department of Health and Human Services records and letters from the victim's father that had not been admitted in evidence.

[¶ 9] The State moved to exclude Plaud's deposition on the grounds that it was unreliable, because (1) the formulas used to generate the graph of sexual interest were proprietary, and therefore had not been subject to general peer review; (2) the test is a psychological instrument to be used in treating sex offenders and in evaluating future risk of sexual abuse, not in determining whether an individual has committed sexual abuse; (3) the Abel Assessment had been tested only on admitted sex offenders; and (4) even when tested on admitted sex offenders, the test had a potential error rate of between 21% and 32%. The court determined that the testimony was neither reliable nor relevant, and therefore was inadmissible.

[¶ 10] After the jury found Ericson guilty on all counts, he was sentenced to concurrent terms of imprisonment resulting in an ultimate sentence of seventeen years, with all but twelve years suspended, and four years probation.

## II. DISCUSSION

### A. Admissibility of the Expert Witness Testimony

[¶ 11] Maine Rule of Evidence 702, which governs the admission of expert witness testimony, provides, "[I]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Before admitting evidence pursuant to this Rule, the trial court must determine that the testimony (1) is relevant in accordance with M.R. Evid. 401, and (2) "will assist the trier of fact in understanding the evidence or determining a fact in issue." *Searles v. Fleetwood Homes of Pa., Inc.,* 2005 ME 94, ¶ 21, 878 A.2d 509, 515–16 (citing *State*

*v. Williams,* 388 A.2d 500, 504 (Me.1978)). The testimony must also meet a threshold level of reliability. *State v. Bickart,* 2009 ME 7, ¶ 14, 963 A.2d 183, 187.

[¶ 12] For proffered evidence to meet the threshold level of reliability, the court need not find that the expert's methods are generally accepted. *Id.* Instead, the court must satisfy itself "that the proffered evidence is sufficiently reliable to be held relevant" by considering indicia such as

(1) whether any studies tendered in support of the testimony are based on facts similar to those at issue; (2) whether the hypothesis of the testimony has been subject to peer review; (3) whether an expert's conclusion has been tailored to the facts of the case; (4) whether any other experts attest to the reliability of the testimony; (5) the nature of the expert's qualifications; and (6) if a causal relationship is asserted, whether there is a scientific basis for determining that such a relationship exists.

*Id.* ¶ 15, 963 A.2d at 187–88 (quotation marks omitted). We review a court's refusal to admit expert testimony for an abuse of discretion. *Id.* ¶¶ 15, 27, 963 A.2d at 188, 191.

[¶ 13] Ericson argues that the court abused its discretion by excluding Plaud's testimony because there was sufficient evidence that the Abel Assessment produced reliable results. However, we agree with the trial court that there are significant concerns with the reliability of the Abel Assessment, including that (1) it has not been subject to adequate peer review because the formula used to assess test results is proprietary and not subject to review; (2) the test is not assessment has been tested only on admitted sex offenders; and (4) even when taken by ad-

mitted sex offenders, the test has a potential error rate of between 21% and 32%.

[¶ 14] Because the test was unreliable, it was not relevant. *See Tolliver v. Dep't of Transp.*, 2008 ME 83, ¶ 29, 948 A.2d 1223, 1233 (explaining that an expert opinion that is formulated using an unreliable methodology has no probative value). Accordingly, the trial court acted within its discretion in excluding Plaud's deposition testimony on the basis that it was neither reliable nor relevant.

## B. Waiving the Right to Testify

[¶ 15] A criminal defendant has a constitutional right to be heard in his own defense. *State v. Tuplin*, 2006 ME 83, ¶¶ 9–11, 901 A.2d 792, 795–96. And, as with other constitutional rights, a defendant may relinquish the right to testify through a voluntary and knowing waiver. *Id.* ¶ 14, 901 A.2d at 796. In deciding whether a right has been waived, we apply a bifurcated review. *Id.* ¶ 13, 901 A.2d at 796. The factual findings made by the trial court are reviewed for clear error, while "the ultimate issue of waiver" is reviewed de novo. *Id.* (quotation marks omitted); *accord State v. Watson*, 2006 ME 80, ¶ 31, 900 A.2d 702, 713.

[¶ 16] Waiver, or the "intentional relinquishment or abandonment of a known right or privilege," may be shown by the totality of the circumstances. *Tuplin*, ¶¶ 14, 15, 901 A.2d at 796 (quotation marks omitted). Thus, it is possible to infer waiver from a defendant's conduct. *Id.* ¶ 15, 901 A.2d at 796. For example, we have concluded that the totality of the circumstances were sufficient to imply intentional waiver of the right to testify when a defendant willfully absconded on the last day of trial and consequently missed his opportunity to testify. *State v. Chasse*, 2000 ME 90, ¶¶ 9–10, 750 A.2d 586, 589–90.

[¶ 17] Just as a defendant who intentionally absconds from trial may relinquish the right to be heard, *see id.*, or a disruptive defendant may waive the right to be present in the courtroom, *see State v. Murphy*, 2010 ME 140, ¶ 17, 10 A.3d 697, 701–02, a defendant who refuses to testify in a manner that is consistent with the direction of the court may waive the right to testify, *see United States v. Nunez*, 877 F.2d 1475, 1478 (10th Cir.1989) (stating that a defendant may waive the right to testify by contumacious conduct). The right to testify does not relieve a defendant from compliance with "established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); *see also Rock v. Arkansas*, 483 U.S. 44, 55 & n. 11, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987).

[¶ 18] Here, Ericson continued to testify to inadmissible evidence after the court instructed him to stop, forcing the court to excuse the jury. The court warned both Ericson and his attorney that Ericson could waive his right to testify through his conduct, but Ericson refused to agree to confine his testimony to matters admissible under the rules of evidence. Based on the totality of the circumstances, the trial court could properly infer that Ericson had intentionally waived his right to testify.

## C. Cross–Examination of the Victim

[¶ 19] Ericson contends that the court erred in prohibiting him from cross-examining the victim about her allegation that her father had tied her around the wrists to a pole in the basement. He argues that this evidence is admissible as conduct probative of truthfulness or un-

truthfulness, *see* M.R. Evid. 608(b)(1), or alternatively is probative of his defense theory that the victim fabricated stories to manipulate her living arrangements, *see State v. Filler*, 2010 ME 90, ¶¶ 15–20, 3 A.3d 365, 370–71; M.R. Evid. 403 (listing grounds upon which relevant evidence may be excluded). We review decisions on admissibility for an abuse of discretion. *State v. Dwyer*, 2009 ME 127, ¶ 31, 985 A.2d 469, 478.

 [¶ 20] With regard to Ericson's first contention, this evidence was not admissible under Rule 608(b)(1).[4] Rule 608(b) permits an attack on a witness's credibility through cross-examination on specific instances of the witness's prior conduct that are probative of truthfulness or untruthfulness, but prohibits rebuttal of "a denial of the alleged misconduct by the contradictory testimony of another witness." Field & Murray, *Maine Evidence* § 608.2 at 299 (6th ed.2007). Thus, a prior accusation by the victim, even one which the defendant contends is " 'inherently incredible,' " is unlikely to be probative of truthfulness or untruthfulness unless the victim has admitted that the accusation was false. *State v. Almurshidy*, 1999 ME 97, ¶¶ 23, 25 & n. 4, 732 A.2d 280, 286, 287. Here, the victim had not admitted that the allegation she made regarding her father was false, and Ericson would be prohibited from offering rebuttal evidence from another witness to establish its falsity. Ac-

cordingly, the testimony that Ericson sought to admit was not probative of credibility pursuant to Rule 608(b).

 [¶ 21] We also conclude that the court did not abuse its discretion in limiting the scope of Ericson's cross-examination of the victim as to his defense theory. The court determined that Ericson had successfully exposed the victim's preference for living with her foster family and that testimony regarding the victim's alleged accusation that her father tied her up in the basement was "collateral." From the context of the Superior Court's statements, we infer that the court found that the victim's alleged accusation failed the Rule 403 balancing test.[5]

[¶ 22] Although evidence tending to show that a witness has a motive for falsifying or exaggerating trial testimony is relevant to credibility, *Filler*, 2010 ME 90, ¶ 17, 3 A.3d at 370, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury," among other grounds, M.R. Evid. 403. In the instant case, by his offer of proof, Ericson represented to the court that the father would deny the victim's allegations that he had tied her to a pole in the basement. Presenting evidence related to the truth or falsity of the victim's allegations against her father would have confused the issues, creating a trial within a trial regarding

4. Maine Rule of Evidence 608(b) states, in relevant part:

Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's credibility, other than conviction of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness's character for truthful-

ness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

5. A Maine treatise refers to collateral matters as those "which at the worst confuse the issues or are unduly prejudicial and at the best consume an inordinate amount of time." Field & Murray, *Maine Evidence* § 403.4 at 126 (6th ed.2007).

whether the victim or her father was telling the truth. *Cf. State v. Steen,* 623 A.2d 146, 149–50 (Me.1993) (holding that the trial court did not abuse its discretion in prohibiting cross-examination on an allegation that the victim had made a prior false accusation of sexual assault). Therefore, although we recognize that exposure of a complaining witness's motivation "is a proper and important function of the constitutionally protected right of cross-examination," *Filler,* 2010 ME 90, ¶ 17, 3 A.3d at 370 (quotation marks omitted), in this case the court acted within its discretion in excluding the testimony Ericson sought to elicit from the victim.

The entry is:

Judgment affirmed.