MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:     2017 ME 25
Docket:       Yor-16-182
Argued:       December 15, 2016
Decided:      February 2, 2017
Corrected:    July 27, 2017

Panel:        SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, and HJELM, JJ.

## STATE OF MAINE

v.

## KARL MAINE

JABAR, J.

[¶1]  Karl Maine appeals from a judgment entered by the Superior Court (York County, *O'Neil, J.*) following a jury verdict convicting him of one count of arson (Class A), 17-A M.R.S. § 802(1)(A) (2016).  Maine argues on appeal that the trial court erred by admitting expert testimony concerning the cause of a fire that largely destroyed a diner run by Maine and by allowing an acquaintance of Maine to testify to statements made to Maine about how to start house fires, and that the evidence presented at trial was insufficient to support a guilty verdict.  We affirm.

### I.  BACKGROUND

[¶2]  The jury could rationally have found the following facts beyond a reasonable doubt.  *State v. Troy*, 2014 ME 9, ¶ 3, 86 A.3d 591.  In January 2013,

Maine began leasing and operating Jake's Diner ("the diner") on Ossipee Trail in Limington.  Aaron Sleeper owned the building housing the diner as well as a commercial building containing a grocery store—Sleeper's Supermarket ("the market")—located across a parking lot from the diner.  Maine had a month-to-month lease and was therefore free to exit the lease at any time.  He purchased groceries for the diner from the market, and included payment for the groceries in his monthly rent check.  In January 2014, Maine was behind on rent by one month and owed Sleeper $541 for groceries.  Maine also owed money to several utilities, including more than $1,000 for propane deliveries and more than $900 for electrical service.

[¶3]   In addition to operating the diner, Maine held a job as a subcontractor for Lock & Load Property Services, a foreclosed property management company run by Catherine Ford.  Ford knew that Maine was having financial troubles and she had paid his cell phone bill in December 2013 and January 2014.  She had also personally purchased groceries for the diner when Maine was unable to do so.  At some point before January 2014, Maine told Ford that he was "sick" of running the diner and was thinking about closing it down for the winter.  Maine also told William Shaw, who owned an auction and yard sale business across the street from the diner,

3

that business at the diner was slow and that he owed a lot of money to the market.

[¶4]  On the morning of February 12, 2014, per his usual routine, Maine arrived at the diner before 7:00 a.m. to do prep work for the day.  His employees, a waitress and a cook, arrived to begin work at 7:00 a.m.  Maine left at approximately 8:00 a.m. to work for Ford, who would meet him there in the morning before his shifts for Lock & Load.  Maine and another subcontractor for Lock & Load left their vehicles in the diner parking lot for the day while they worked on a foreclosed property in New Hampshire.  The waitress and the cook ran the diner, closing up at 2:00 p.m.  Before leaving, they locked all the doors.

[¶5]  A security camera at the market that was pointed toward the diner captured Maine, Ford, and Ford's other subcontractor returning just before 5:00 p.m.  Video from that camera shows Maine approaching the front door of the diner at 4:55 p.m., disappearing from view, and reappearing from the area of the front door approximately six minutes later.  Maine then went to his truck—parked near the front of the diner—and returned to the entrance of the diner at 5:02 p.m., disappeared from view, reappeared from the front door area at approximately 5:03 p.m., and finally got into his truck and drove away.

The video then depicts smoke emanating from the rear of the diner at approximately 5:05 p.m.

[¶6]  One of Sleeper's employees at the market noticed the smoke and alerted Sleeper, who called 9-1-1.  Two engines from the fire department arrived at 5:13 p.m., and firefighters extinguished the blaze with water after breaking in the front door.  Maine arrived about half an hour later and provided a statement to the Limington fire chief, who then called the Fire Marshal's Office to request an investigation into the cause of the fire.

[¶7]  Senior Investigator Mark Roberts of the Maine State Fire Marshal's Office responded to the scene of the fire at approximately 6:30 p.m. that evening.  He interviewed Maine, who told Roberts that he had entered the diner only once after returning from New Hampshire, to collect receipts, and that he had been inside for less than one minute.

[¶8]  The next day, Roberts accompanied Senior Investigator Daniel Young, who was responsible for determining the origin and cause of the fire, to the scene.  They both examined the diner, and Young took photos of the damage.  Maine also returned to the scene, and again advised the investigators that prior to the conflagration he had entered the diner only once.

[¶9]   On February 25, 2014, Maine went to the Limington police department at Roberts's request to further discuss the details of the fire.  Even after Roberts played the security footage for him, Maine denied that he had entered the building twice, instead maintaining that he had gone in only once, for less than one minute, to retrieve the receipts.

[¶10]   Based upon interviews with Maine and other witnesses, the security footage, and their examination of the physical damage to the diner, both Roberts and Young concluded that the fire had originated in a small storage room at the back of the diner and was an incendiary, rather than accidental, fire.  Young concluded that, due to the timing of Maine's entry into the diner and the escape of smoke only minutes later, Maine had used an open flame to ignite some cardboard boxes in the storage room.  Daniel Roy, an investigator for Sleeper's insurance company,[1] also investigated the origin and cause of the fire, and reached the same conclusion.

[¶11]  Maine was indicted by grand jury on May 6, 2014, with one count of arson (Class A), 17-A M.R.S. § 802(1)(A).  Prior to trial, Maine filed several motions in limine, including a motion to exclude testimony from William Shaw

---

[1]  Maine did not have insurance; the diner was covered by a policy held by Sleeper, who received approximately $148,000 compensation for the fire, which he used to pay down a mortgage secured by the entire property—including the market and the diner.

that Shaw and Maine had a conversation concerning burning down homes. The motion was denied. At trial, Shaw testified that at some point he had told Maine that "down in Kentucky, where I'm from, when somebody wants a new home, they just cross the wires on the water heater, wait about an hour, hour and a half, two hours and it sparks and starts a fire."

[¶12] Maine also moved in limine to exclude or limit Roberts's testimony, and to exclude or limit Young's testimony. Following voir dire, the court allowed Roberts, Young, and Roy to testify extensively regarding their methods of inspection and conclusions about the origin and cause of the fire. Maine presented his own expert witness who testified to various purported shortcomings of the other experts' methods and conclusions, and opined on other possible causes.

[¶13] The jury returned a guilty verdict on February 26, 2016. Maine was sentenced to sixteen years' imprisonment, with all but eight years suspended, and four years of probation. He timely appealed. *See* M.R. App. P. 2(b)(2)(A).

## II. DISCUSSION

A. Issues on Appeal

[¶14] Maine presents three issues on appeal. First, he argues that the trial court abused its discretion by not excluding testimony from Young and Roy as to the cause of the fire because their independent determinations that the fire was caused by human ignition had no demonstrable scientific basis and were therefore inadmissible. Second, Maine asserts that the trial court abused its discretion by allowing Shaw to testify as to the statements he had made to Maine about starting fires with water heaters because those statements had low probative value and presented a risk of unfair prejudice and misleading the jury. Finally, he argues that the evidence presented was not sufficient to establish beyond a reasonable doubt that Maine intentionally set fire to the diner.

B. Expert Testimony

[¶15] Maine contends that the trial court was required to consider "whether there was a scientific basis for determining that a causal relationship existed" between the fire and what the State's experts testified to be the cause of the fire. According to Maine, Young's and Roy's reliance on the

process of elimination to rule out alternative causes of the fire was not a proper application of the scientific method.

[¶16]  "We review a court's foundational finding that expert testimony is sufficiently reliable for clear error," *Searles v. Fleetwood Homes of Pa., Inc.*, 2005 ME 94, ¶ 24, 878 A.2d 509, and review for an abuse of discretion a court's decision to admit an expert's opinion after finding it reliable, *State v. Diana*, 2014 ME 45, ¶ 35, 89 A.3d 132; *see also State v. Tucker*, 2015 ME 68, ¶ 15, 117 A.3d 595.

[¶17]  Expert testimony must "meet a threshold level of reliability," and must (1) be relevant in accordance with M.R. Evid. 401, and (2) assist the trier of fact in understanding the evidence or determining a fact in issue.  *State v. Ericson*, 2011 ME 28, ¶ 11, 13 A.3d 777 (quotation marks omitted).  Indicia of threshold reliability include

> (1) whether any studies tendered in support of the testimony are based on facts similar to those at issue; (2) whether the hypothesis of the testimony has been subject to peer review; (3) whether an expert's conclusion has been tailored to the facts of the case; (4) whether any other experts attest to the reliability of the testimony; (5) the nature of the expert's qualifications; and (6) if a causal relationship is asserted, whether there is a scientific basis for determining that such a relationship exists.

*Id.* ¶ 12 (quotation marks omitted); *see also State v. Williams*, 388 A.2d 500, 504 (Me. 1978).

[¶18]  Here, during voir dire, Young provided a detailed description of his qualifications and method of investigation.  Relying upon the data he gathered during his investigation, his extensive training in investigating fires, and a variety of scientific literature about the causes of fires, he eliminated all possible causes other than an incendiary cause.  He then relied upon the security video from the market to conclude that, based on the brief period of time between when Maine left the diner and when smoke began emanating from the diner, as well as the color of the smoke, Maine had likely ignited cardboard in the storage room to cause the fire.  Roy employed a nearly identical process of investigation to Young's, and similarly concluded that, based on video footage from the security camera and the timeline of events, the fire was incendiary and intentional.[2]

[¶19]  Young's and Roy's opinions meet several indicia of threshold reliability.  *See Ericson*, 2011 ME 28, ¶ 12, 13 A.3d 777.  First, after independently investigating the cause of the fire, both reached the same conclusion about the cause.  Next, their opinions were based on a scientific method described by Young during Young's voir dire and by Roy during Roy's

---

[2] The court admitted Roy's opinion over Maine's foundational objection without voir dire.

direct and cross-examination, then corroborated by Roberts.[3] *See State v. Irving*, 2003 ME 31, ¶ 14, 818 A.2d 204 (where three qualified experts testified to the reliability of use of a particular methodology in determining vehicle speed, a court did not abuse discretion in admitting another expert's opinion based on that methodology). Further, they both tailored their conclusions regarding the cause of the fire to the facts of the case, including ruling out natural and accidental causes.

[¶20] There was no error in the trial court's finding that Young's opinion was "based on the elimination of the accidental sources of ignition coupled with the defendant's access to the premises and the issues involving the white smoke being consistent with the cardboard being set on fire," and no error in its finding that Young's opinion, as well as Roy's, was reliable. Despite Maine's contentions, the State's experts reached their conclusions after careful, scientific consideration of each potential cause of the fire.

[¶21] Maine presented his own expert, who testified that he used a nearly identical approach to fire investigation as that described by Young and Roy—even relying upon the same published guidelines as Young and

---

[3] Roberts testified that the investigatory methods used by Young and Roy in their respective inspections of the diner were scientifically valid. He also confirmed that the research sources upon which they relied were professional guides frequently relied upon by experts in the field.

Roberts—but reached different conclusions regarding the origin and cause of the fire. Maine's argument on appeal is therefore properly understood as a disagreement with the conclusions of the State's experts rather than a meritorious objection to the methods employed by the State's experts. Questions related to possible alternative causes of the fire properly "go to the weight of the evidence, not its sufficiency," *State v. Spearin*, 447 A.2d 1147, 1152 (Me. 1984), and it is the jury's role to weigh the evidence and determine witness credibility, *see State v. Weaver*, 2016 ME 12, ¶ 14, 130 A.3d 972. The trial court therefore did not clearly err in finding that the State's experts were sufficiently reliable, and did not abuse its discretion in admitting their opinion testimony concerning the cause of the fire.

C.     Prior Conversations

[¶22]  Maine next contends that the trial court abused its discretion by allowing Shaw to testify about statements he made to Maine regarding starting fires with water heaters, arguing that because the testimony had no or extremely low probative value, any probative value of the statements was substantially outweighed by the risk of unfair prejudice and misleading the jury.

[¶23]  "[W]e review a trial court's rulings on relevance for clear error," *State v. Dolloff*, 2012 ME 130, ¶ 24, 58 A.3d 1032, and rulings on admissibility for an abuse of discretion, *State v. Mills*, 2006 ME 134, ¶ 8, 910 A.2d 1053.  A court abuses its discretion in ruling on evidentiary issues "if the ruling arises from a failure to apply principles of law applicable to a situation resulting in prejudice."  *State v. Bennett*, 658 A.2d 1058, 1062 (Me. 1995) (quotation marks omitted).

[¶24]  Only relevant evidence—evidence that has a tendency to make a fact more or less probable—is admissible.  M.R. Evid. 401, 402.  Even relevant evidence, however, is inadmissible if "its probative value is substantially outweighed by a danger of . . . unfair prejudice, . . . [or] misleading the jury."  M.R. Evid. 403.  Courts have wide discretion to determine the admissibility of evidence pursuant to M.R. Evid. 403.  *State v. Filler*, 2010 ME 90, ¶ 17, 3 A.3d 365.  The "mere fact that an inference contrary to a defendant's contentions can be drawn from the testimony does not suffice to render the testimony unfairly prejudicial."  *State v. Stack*, 441 A.2d 673, 676 (Me. 1982).

[¶25]  Shaw's testimony here is not unfairly prejudicial.  Shaw testified on direct examination that he and Maine were friendly, and that on one occasion prior to the fire, he told Maine that "down in Kentucky, where I'm

13

from, when somebody wants a new home, they just cross the wires on the water heater, wait about an hour, hour and a half, two hours and it sparks and starts a fire." Shaw then testified on redirect examination that Maine asked him whether it worked, and Shaw replied that "evidently, yes, it does." Shaw also testified that Maine had discussed the diner's financial difficulties with him: Shaw stated that Maine "owed Sleeper's Market a lot of money, [and] was getting behind."

[¶26] It was never the State's theory of the case that Maine had vandalized his water heater to cause the fire. The evidence was not introduced to show that Maine had ever intended to use the water heater to start a fire. Rather, the evidence was introduced to show that Maine had been discussing arson in the context of his financial difficulties. The evidence had some probative value and it was not in itself so unfairly prejudicial as to substantially outweigh the probative value of the remarks. Based on Shaw's testimony, the jury could have made limited inferences that Maine had been discussing methods of causing fires in buildings, and had the intent to burn down the diner to rid himself of his financial problems.[4]

---

[4] The court never conducted a Rule 403 analysis following Maine's objection to Shaw's testimony. However, to the extent the court's failure to conduct such an analysis was error, any error was harmless. *See, e.g.*, *State v. DeMass*, 2000 ME 4, ¶ 17, 743 A.2d 233 (stating that an error "is harmless when it is highly probable that it did not affect the jury's verdict").

D.     Sufficiency of the Evidence

[¶27]  Finally, Maine argues that the evidence presented by the State was insufficient to establish beyond a reasonable doubt that Maine intentionally set the fire because the State could not prove the scientific basis for its experts' conclusions that the fire was ignited rather than accidental or natural.

[¶28]  When reviewing a judgment for sufficiency of the evidence, we "view the evidence in the light most favorable to the State [to] determin[e] whether the fact-finder could rationally have found each element of the offense beyond a reasonable doubt."  *State v. Reed*, 2013 ME 5, ¶ 9, 58 A.3d 1130 (quotation marks omitted).  Additionally, we "defer to all credibility determinations made by the fact-finder."  *State v. Hodson*, 2016 ME 46, ¶ 8, 135 A.3d 816.  "[F]actual findings may be supported by reasonable inferences drawn from all the circumstances even if those inferences are contradicted by parts of the direct evidence."  *State v. Stinson*, 2000 ME 87, ¶ 8, 751 A.2d 1011.

[¶29]  A person may be convicted of arson if the State proves beyond a reasonable doubt that he or she started, caused, or maintained a fire (1) on the property of another with the intent to damage or destroy it; or (2) on his

or her own property or the property of another and either recklessly endangers another person or the property or has the intent to collect insurance proceeds. 17-A M.R.S. § 802(1) (2016). Here, the State alleged that, pursuant to the first prong of the arson statute, Maine started, caused, or maintained a fire on Sleeper's property with the intent to damage or destroy it. *See id.* § 802(1)(A).

[¶30] Based upon the evidence presented at trial and the reasonable inferences drawn therefrom, *see State v. Williams*, 2012 ME 63, ¶ 49, 52 A.3d 911, the jury could rationally have found beyond a reasonable doubt that on February 20, 2014, Maine entered the diner, which Sleeper owned, and set fire to cardboard boxes in the storage room with the intent to damage or destroy the property.

[¶31] Although security footage from the market did not clearly show Maine opening the front door to the diner and entering the building, because the video showed him approaching the front door, disappearing from view, reappearing approximately five minutes later, then returning to the diner after doing something at his truck and again reappearing approximately one minute later, the jury could have inferred that he entered the building during the time during which he was not visible. Further, despite Maine's

contentions on appeal that Young and Roy could not have reached a scientifically reasonable conclusion that the fire was incendiary, based on their testimony—in particular with regard to the timing of the appearance and the color of the smoke seen on the security video, and the pattern of damage to the diner—the jury could have found that while inside the diner, Maine ignited cardboard in the storage room.  For these reasons, and those described above, there was sufficient evidence for the jury to find that Maine committed the crime of arson as charged.

The entry is:

Judgment affirmed.

---

Lauren Wille, Esq. (orally), DeGrinney Law Offices, Portland, for appellant Karl Maine

Kathryn Loftus Slattery, District Attorney, Anne Marie Pazar, Asst. Dist. Atty., and Justina A. McGettigan, Asst. Dist. Atty. (orally), Prosecutorial District #1, Alfred, for appellee State of Maine

York County Superior Court docket number CR-2014-513
FOR CLERK REFERENCE ONLY