STATE OF MAINE
CUMBERLAND, ss.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-20-532

TOWN OF BUXTON,

    Plaintiff,

       v.

GORHAM SAND & GRAVEL, INC.,

    Defendant,

**ORDER ON MOTION IN
LIMINE**

REC'D CUMB CLERKS OF(
JUN 23 '23 AM8:07 ·

Before the Court is a motion in limine filed by Plaintiff Town of Buxton ("Town") on January 5, 2023. After unopposed extensions, Defendant Gorham Sand and Gravel, Inc. ("GSG") timely opposed the Motion February 9, 2023, and the Town timely filed its reply March 15, 2023. In a telephonic conference on June 6, 2023, the parties agreed the Court would rule on this motion on the filings alone.

This is an action for subrogation by the Town. It asserts one count for negligence against GSG, based on allegations that GSG piled sand and salt in a Town storage structure in such a way that compromised the integrity of the structure, eventually causing the structure to collapse. The Town claims it was then required to replace the structure at a cost of $520,836.20, with the Town's insurance policy issued by the Maine Municipal Property and Casualty Pool ("Pool") paying $510,836.20.

GSG has admitted liability in the case, leaving extent of damages as the sole issue. The Town moves in limine to exclude GSG's expert from testifying concerning his opinion on the projected life expectancy of the Town's structure; exclude any references to the Town's

1

membership in the Pool, its coverage, or policies; and clarify the appropriate measure of damages to which Plaintiff is entitled.

### 1. Measure of Damages

The Town argues that the cost of repairing the damaged property is the proper measure of damages. GSG argues that the proper measure of damages is the actual cash value of the structure at the time of the incident, also measurable by the cost of repair less the structure's depreciation since its erection, or that the jury should hear both theories and decide which is appropriate. The Town's reply argues that GSG should not be permitted to use the terms "Replacement Value" and "Actual Cash Value" because the terms imply to the jury that the Town was insured and therefore violate the collateral source rule.

Proper measure of damages is a question of law. *Ford Motor Co. v. Darling's*, 2016 ME 171, ¶ 16, 151 A.3d 507 (citing *Estate of Wilde*, 1998 ME 55, ¶ 7, 708 A.2d 273). The Law Court has announced no bright line rule on how to measure damages to property. Property loss caused by a defendant's negligence may be measured either by the value of the pre-damaged property less its salvage value or by expenses incurred in repairing it. Alexander, *Maine Jury Instruction Manual* § 7-107 & cmt. (2023 ed.) ("The appropriate formulation would depend on the circumstances of the case."); Simmons, Zillman & Furbish, *Maine Tort Law* § 19.02 (2020 ed.); *see* 22 Am. Jur. 2d *Damages* § 278 (2023). Courts often limit repair costs to the cost of restoring the property, not including improvements. *See Leavitt v. Cont'l Tel. Co.*, 559 A.2d 786, 788 (Me. 1989) (adopting Restatement (Second) of Torts § 929); Horton & McGhee, *Maine Civil Remedies* § 4-3(c)(7) at 67-68 (4th ed. 2004). In deciding between measures of damages for negligence, "that measure which most precisely compensates a plaintiff for its loss and which may be used without conjecture

2

or speculation should be applied." *Wendward Corp. v. Grp. Design, Inc.*, 428 A.2d 57, 62 (Me. 1981).

The parties agree that in this case the damaged structure was fully replaced with a new salt and sand storage structure. The Town claims that the replaced structure, aside from its newness, does not carry improvements as compared to the pre-collapse structure. To avoid conjecture and speculation, and in recognition of the municipal service the structure performs, the Court concludes that the proper measure of damages is the cost to repair the structure to its pre-collapse condition.

2. GSG's Expert Testimony

The Town argues that GSG's expert witness Mr. James A. Moran III (1) should not be permitted to testify on the projected life expectancy of the structure because his methodology for acquiring his opinion and the information his opinion is based on are unreliable, (2) Mr. Moran is not qualified to render an opinion on the projected life expectancy of the structure, and (3) Mr. Moran is not qualified to testify concerning the maintenance required for or performed on the structure at issue.

First, the Court concludes that Mr. Moran is qualified to testify concerning the maintenance required for and the projected life expectancy of the structure pre-collapse. Maine Rule of Evidence 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if such testimony will help the trier of fact to understand the evidence or to determine a fact in issue.

Defendant's Ex. A, Deposition of James Moran, shows that Mr. Moran has a bachelor's degree in civil engineering; at least nine years of work at consulting engineering firms; decades of work experience with engineering structures, including designing foundations for wood dome structures like the one at issue in this case; and substantial experience as a structural engineer, designing new

3

buildings and evaluating existing buildings. His engineering license has lapsed because of his decision to retire, but that lapse only occurred in the time since he prepared his expert report. The Court finds his relevant knowledge, experience, and education sufficient to satisfy Rule 702 with respect to the life expectancy and required maintenance for wooden dome-shaped structures.

However, the Court agrees with the Town that the resources on which Mr. Moran based his opinion about life expectancy of the structure are unreliable and/or insufficient. The Town argues that articles by manufacturers of a competing, fabric-based product are unlikely to be objective. This includes an article from the Salt Institute that was contributed by a manufacturer of competing fabric-based products. The Town also argues that neither the Colorado department of transportation website nor the Salt Institute article gave actual estimates of lifespan. It claims a city public works website is inadequate because it states that a 20-year old wooden dome structure is at the end of its useful life without any other relevant facts. GSG argues that Mr. Moran's experience helped him to form his opinions and that questions about information he relied on in forming his opinions go to weight rather than admissibility.

Before deciding that expert testimony is admissible, a court must make a preliminary finding that the testimony will be reliable. *State v. Rourke*, 2017 ME 10, ¶ 11, 154 A.3d 127 (citing *State v. Ericson*, 2011 ME 28, ¶ 12, 13 A.3d 777). Indicia of reliability include

> (1) whether any studies tendered in support of the testimony are based on facts similar to those at issue; (2) whether the hypothesis of the testimony has been subject to peer review; (3) whether an expert's conclusion has been tailored to the facts of the case; (4) whether any other experts attest to the reliability of the testimony; (5) the nature of the expert's qualifications; and (6) if a causal relationship is asserted, whether there is a scientific basis for determining that such a relationship exists.

*Ericson*, 2011 ME 28, ¶ 12, 13 A.3d 777. Testimony that is unreliable is not relevant. *Tolliver v. Dep't of Transp.*, 2008 ME 83, ¶ 29, 948 A.2d 1223.

4

The Court concludes that the material supporting Mr. Moran's opinion on the life expectancy of the structure is insufficient for the reasons the Town argues. Therefore, Mr. Moran's testimony is not relevant. None of the resources on life expectancy that Mr. Moran used appear to be peer-reviewed or based on reliable data. Moreover, the Court agrees the information from companies that mostly manufacture fabric structures, which the market currently prefers, is at significant risk of bias, and the remaining materials do not contain sufficient relevant information on life expectancy and/or are not tied to authors with demonstrable expertise or reliability. While Mr. Moran did apparently go to the site of the collapse, there is no evident connection between the state and history of the structure at issue and the other structures considered in Mr. Moran's materials.

Mr. Moran's expert report states that in order to render an opinion on the life expectancy of the structure, he

> researched on-line looking for technical articles on this subject, as well as manufacturers' literature. We found some information prepared by various sources: building manufacturers, State DOT's, and The Salt Institute. The references provided varying terms of 10-20 years for the average life expectancy of a timber salt storage shed. They all stated that maintenance of the timber structure is key to the life expectancy. Maintenance includes repairing damaged wood members, repairing roof leaks, repairing loose/separated connections, keeping the stored salt-sand materials off of wood members, and periodically treating the wood members with preservatives.

Def.'s Ex. C at 4. Mr. Moran's report indicates that he used unreliable materials to formulate his opinion on the life expectancy of the dome structure. As such that opinion is inadmissible.

With regard to his opinion on maintenance of the structure, the materials he references are sufficient to render his opinions relevant. The risk of bias carried by the articles associated with manufacturers of fabric structures poses less of an issue for forming an opinion about required maintenance. The Colorado department of transportation website seems to contain adequate

5

information on maintenance as compared with the lack of information on life expectancy. However, the Court concludes that Mr. Moran's relevant opinion only extends to what was required for maintenance of the structure and not how the structure was maintained nor how that would impact its life expectancy. This information is only relevant to the extent it relates to the state of the structure pre-collapse, if GSG intends to present such evidence. The Court also concludes Mr. Moran's experience and education adequately support his opinion about the state of the structure after it had collapsed and what, if anything, that state indicated about the structure's condition before it collapsed.

### 3. Debra Marquis and Evidence of Insurance

The Town intends to call Debra Marquis to testify that she investigated the loss on the Town's behalf, that she concluded that GSG caused the structure to fall, and about the total amount of damages the Town sustained due to the collapse. The Town moves to exclude any evidence of insurance coverage, specifically, evidence of Debra Marquis's knowledge and experience as a property and casualty insurance representative. GSG responds that it does not intend to introduce the fact that the Town was insured by the Pool but that Debra Marquis's experience as an insurance representative for the Maine Municipal Association is relevant and that she should be allowed to testify on the differences between cash value and replacement cost.

"Mention of insurance coverage, whether deliberate or inadvertent, is usually 'immaterial, prejudicial, and not admissible' in negligence cases." *Jamshidi v. Bowden*, 366 A.2d 522, 523 (Me. 1976) (quoting *Deschaine v. Deschaine*, 140 A.2d 746, 749 (Me. 1958)); *see also Werner v. Lane*, 393 A.2d 1329, 1335-6 (Me. 1978).

The Court agrees that references to Ms. Marquis's experience as an insurance representative and especially as an insurance representative for the Maine Municipal Association

6

would be prejudicial and a likely end-run around the collateral source rule. Such testimony is therefore inadmissible. Given the Court's conclusion that cost of restoration is the proper measure of damages in this case, Ms. Marquis's proposed testimony about the difference between actual cash value and replacement cost is also not relevant. In addition, the Court agrees with the Town that the parties should avoid the terms "actual cash value" and "replacement cost" to limit prejudice caused by referring to insurance terms. If GSG desires to examine or cross-examine Ms. Marquis, it must do so without mention of insurance or of Ms. Marquis's position at the Maine Municipal Association.

The entry is:

Plaintiffs' Motion in Limine is GRANTED IN PART and DENIED IN PART.

1. The proper measure of damages in this case is the cost to restore the structure.

2. The proposed testimony of Defendant's expert witness James Moran regarding life expectancy of the structure is inadmissible for the reasons stated above. The Court denies the Town's motion with regard to his testimony on required maintenance for like structures and what he observed about the state of the collapsed structure.

3. Evidence concerning Plaintiff's witness Debra Marquis's employment or experience as an insurance representative is not admissible for the reasons stated above.

4. The parties will not use the terms "Replacement Value" and "Actual Cash Value" as they are an indirect reference to insurance coverage.

The clerk shall enter this order on the docket by reference. M.R. Civ. P. 79(a).

Date: June 22, 2023

_____
Deborah P. Cashman
Justice, Maine Superior Court

Plaintiff-Laura Maher, Esq.
Defendant- L John Topchik, Esq. and
John B Schulte, Esq.

7