MAINE SUPREME JUDICIAL COURT                          Reporter of Decisions
Decision:      2016 ME 83
Docket:        Was-15-56
Argued:        March 1, 2016
Decided:       June 7, 2016

Panel:         SAUFLEY, C.J., and MEAD, GORMAN, JABAR, and HJELM, JJ.

STATE OF MAINE

v.

KENNETH FRISBEE

SAUFLEY, C.J.

[¶1]  A jury found Kenneth Frisbee guilty of three crimes involving sexual misconduct.  During jury selection and the trial, a frequent and occasionally disruptive visitor to the Washington County Courthouse caused a brief distraction. Frisbee argues that the court (Washington County, *Stokes, J.*) should have granted his motion for a mistrial because the presence and conduct of that spectator distracted one or more jurors.  We address the competing interests that the court must balance in such a situation, as well as the precautions taken by the court, to ensure that Frisbee received a fair and impartial trial.  We discern no abuse of discretion, and we conclude that Frisbee received a fair trial.  We affirm the judgment.

# I. BACKGROUND

[¶2]   On March 21, 2013, the State filed a two-count complaint in the Superior Court charging Frisbee with unlawful sexual contact (Class B), 17-A M.R.S. § 255-A(1)(E-1) (2015) (other person under age twelve), and unlawful sexual contact (Class C), 17-A M.R.S. § 255-A(1)(E) (2015) (other person under age fourteen).   On September 9, 2013, Frisbee was indicted on the two unlawful sexual contact charges and two additional charges—gross sexual assault (Class A), 17-A M.R.S. § 253(1)(C) (2015) (other person under age twelve), and gross sexual assault (Class A), 17-A M.R.S. § 253(1)(B) (2015) (other person under age fourteen).   Frisbee pleaded not guilty to all of the charges, which were based on allegations that he had sexual contact with and committed sexual assaults on a minor.

[¶3]  During jury selection, Frisbee's attorney noticed that one of his former clients, who had no connection to this matter, was in the courtroom.  The spectator had been convicted of, and had spent eleven months in prison for, threats against Frisbee's attorney and his family.[1]

[¶4]  Frisbee's attorney was not the only one in the courtroom who had a history with this man.  Before becoming a judge, the trial judge had been a

---

[1]  Specifically, the spectator had threatened to drown Frisbee's attorney's children in the brook behind Frisbee's attorney's home.

prosecutor, and he had prosecuted the spectator some twenty years prior, resulting in the spectator being sentenced to jail. The State's attorney had also prosecuted the spectator for the threats against Frisbee's attorney and his family. Finally, the spectator had just been released from prison for charges of criminal threatening involving one of the potential jurors—juror 116—who would later be empaneled on the case.

[¶5] Initially, the court asked the judicial marshals to move the spectator so he would not be directly behind Frisbee's attorney during voir dire of potential jurors, but Frisbee's attorney continued to be distracted because the spectator was glaring at him, smiling, making gestures, and smirking. The court, noting that Frisbee's attorney's fears and concerns regarding the spectator were not "fanciful and not an exaggeration," then instructed the judicial marshals to remove the spectator should he reappear in the courtroom during the remainder of jury selection in order to protect Frisbee's rights to effective assistance of counsel and prevent compromising Frisbee's attorney's professional responsibilities to his client. Jury selection continued without incident.

[¶6] Approximately half-way through the first day of the trial, a marshal informed the court that the spectator was in the courtroom again and had moved closer to juror 116. The court immediately ordered a brief recess. The court, the State, and Frisbee's attorney discussed the spectator's arrival. Frisbee's attorney,

4

who had heard reports that the spectator had recently been seen in the community with a weapon, told the judge that he would not reenter the courtroom until the spectator had been screened by security.[2] The court, considering the spectator's significant history with juror 116 and with the defense attorney, directed security to take the spectator through security screening. The court also interviewed juror 116, who provided her history with the spectator.[3] She stated that she was "very distracted" by the spectator's presence in the courtroom, but that she would not continue to be distracted as long as he was removed from the courtroom.

[¶7] The court concluded that the spectator's presence "is disruptive and distracting . . . he cannot be allowed to distract both the defense attorney and the jury or a juror from paying full attention to this case." The court then indicated that it would not close the courtroom or the courthouse, but it would exclude that spectator from the trial.

[¶8] On the second day of trial, the court was informed that the spectator had been in the building, had made a transcript request, and had been approaching jurors inside and outside the courthouse that morning and asking them to take a

---

[2] It is unclear why, in these circumstances, entry screening or individual screening for weapons had not previously been undertaken.

[3] Upon interviewing juror 116, the court learned that the spectator had threatened to kill her husband and had stalked her teenage daughter. The juror had obtained a protection order against the spectator, but it had expired by the time of this action. The prior year the spectator had pleaded guilty to six counts of violating the protection order.

copy of a book that he had written. Frisbee's attorney requested that the jury be sequestered for the remainder of trial. The court undertook a voir dire of each juror individually to ask whether the spectator had been a distraction or would influence each juror's ability to remain fair and impartial in deciding the case. Several of the jurors had seen the spectator, and several had heard that the spectator had stalked one of the jurors and her family. One juror stated that "some of the ladies on the jury are upset, disturbed." However, all of the jurors except for juror 116 stated that they had not been distracted by the spectator's presence, and all of the jurors stated that the spectator in no way would affect their ability to be fair and impartial. The court did not grant Frisbee's attorney's request for sequestration.

[¶9]   Later that same morning, a judicial marshal alerted the court and the parties that the spectator had left his notebook at the courthouse. In the back of the notebook, there was a note that read, "I wish you were all dead, but since you're not I hope you all die as soon as possible. And with as much agony as possible."

[¶10]   After the notebook was found, Frisbee moved for a mistrial on the ground that the spectator's distraction of the jury on the previous day had interfered with the jurors' ability to devote their full attention to the evidence on that day. In considering the motion, the court found that the jurors had been forthright during voir dire earlier in affirming that they were not distracted by the

spectator and could devote their full attention to the case. In addition, the court noted that it had ordered a recess as soon as the spectator's presence had been noted the previous day. It thus concluded that "the likelihood that there was in fact distraction is low," and it denied Frisbee's motion for a mistrial.

[¶11] At the conclusion of the trial, the jury found Frisbee guilty of Counts 1, 2, and 4—both counts of unlawful sexual contact and one count of gross sexual assault.[4] *See* 17-A M.R.S. §§ 253(1)(B), 255-A(E)-(E-1). Frisbee was sentenced to twelve years' imprisonment, all but five years suspended, with four years of probation on Count 4. The court imposed a three-year concurrent sentence on Count 1 and a two-year concurrent sentence on Count 2. Frisbee timely appealed to us.[5] *See* 15 M.R.S. § 2115 (2015); M.R. App. P. 2.

II. DISCUSSION

A. Standard of Review

[¶12] We review a denial of a motion for a mistrial for abuse of discretion, *Seabury-Peterson v. Jhamb*, 2011 ME 35, ¶ 14, 15 A.3d 746, and we will overrule a denial "only in the event of prosecutorial bad faith or in exceptionally prejudicial

---

[4] The court granted Frisbee's motion for a judgment of acquittal as to Count 3, gross sexual assault (Class A), 17-A M.R.S. § 253(1)(C) (2015); thus, that count was not presented to the jury.

[5] Neither party challenges the sufficiency of the evidence to support the convictions. Reviewing the evidence, and all reasonable inferences that may be drawn from that evidence, in the light most favorable to the jury's verdict, the jury here could have rationally found each element of the crimes proved beyond a reasonable doubt.

circumstances," *State v. Bridges*, 2004 ME 102, ¶ 10, 854 A.2d 855 (quotation marks omitted). There is no allegation of prosecutorial bad faith or misconduct here.

[¶13] Factual findings incident to a ruling on a motion for a mistrial are reviewed for clear error. *See State v. Ardolino*, 1997 ME 141, ¶ 18, 697 A.2d 73. "A motion for a mistrial should be denied except in the rare circumstance that the trial is unable to continue with a fair result and only a new trial will satisfy the interests of justice." *Bridges*, 2004 ME 102, ¶ 11, 854 A.2d 855. Thus, we review the record to determine whether exceptionally prejudicial circumstances— circumstances that denied Frisbee a fair trial—required the grant of the motion for a mistrial.[6]

B.    Constitutional Considerations

[¶14] We first address the various rights, protected by the United States Constitution, that the court sought to balance under the unusual circumstances of this case. Because the rights discussed in this opinion conferred by the Maine Constitution and the United States Constitution are generally coextensive, we focus on the language of the United States Constitution. *See* U.S. Const. amends. I, VI;

---

[6] Frisbee also argues that the court abused its discretion when it denied Frisbee's request to play an audio recording to the jury and instead had the testimony read back by the court reporter when the jury requested to re-hear the testimony of the alleged victim. We discern no abuse of discretion in the court's decision to have testimony read back to the jury by the court reporter.

Me. Const. art I, §§ 4, 6; *State v. Kennedy*, 2016 ME 53, ¶ 8 n.5, --- A.3d --- (right to counsel); *In re Me. Today Media, Inc.*, 2013 ME 12, ¶ 3, 59 A.3d 499 (defendant's right to a public trial and an impartial jury; public's right to observe criminal trials); *cf. State v. Cain*, 2006 ME 1, ¶ 5 n.1, 888 A.2d 276 (referencing consistency in application of portions of the Sixth Amendment of the United States Constitution and article one, section six of the Maine Constitution).   Although Frisbee primarily argues that his right to a fair and impartial jury was negatively affected by the spectator's presence, we address the other rights at issue because the court has the responsibility and the authority to balance those rights when they are in conflict.   In addition, for clarity, we take this opportunity to distinguish between a full closure of a courtroom and a partial closure or less significant restriction.

1.     Defendant's Right to a Public Trial

[¶15]   "In all criminal prosecutions, the accused shall enjoy the right to a speedy and *public* trial . . . ."   U.S. Const. amend. VI (emphasis added).   The guarantee of a public trial in criminal proceedings is "for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions."   *Roberts v. State*, 2014 ME 125, ¶ 19, 103 A.3d 1031 (quotation marks

omitted); *see* U.S. Const. amends. VI, XIV. The defendant's right to the public's presence during trial may be demonstrated through a significant number of observers, or it may include only a few spectators, but the right exists regardless of the extent of public interest in a trial.

2.    The Public's Right to Observe Criminal Trials

[¶16]   Similarly, the public, sometimes represented by the media, has its own right to observe criminal trials. *See In re Me. Today Media, Inc.*, 2013 ME 12, ¶ 6, 59 A.3d 499. Unlike the defendant's right to a public trial, this right is not founded in the Sixth Amendment of the United States Constitution; instead, the First Amendment of the United States Constitution protects the public's right, which is also derived from the longstanding tradition of opening criminal proceedings to the public.[7]  *Press-Enter. Co. v. Superior Court of Cal.*, 464 U.S. 501, 508 (1984); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 575-76 (1980).

[¶17]   When the court is called upon to balance these disparate rights, the purpose of the rights at issue must be considered. The primary reasons for the right of the public and the press to observe criminal trials are twofold: first, the watchful eye of the public is understood to ensure a fair trial for the defendant; and

---

[7]  It is primarily for this reason that courtrooms and courthouses must be open throughout a criminal trial, except in unusual circumstances not applicable here.

second, the public's right to observe criminal trials is expected to enhance public confidence in the courts and criminal justice system. *Press-Enter. Co.*, 464 U.S. at 508. Noting that the defendant's right to a public trial is not always coextensive with the public's right to be present during criminal proceedings, the United States Supreme Court has addressed the balance of these interests:

> For present purposes, how we allocate the 'right' to openness as between the accused and the public, or whether we view it as a component inherent in the system benefiting both, is not crucial. *No right ranks higher than the right of the accused to a fair trial.* But the primacy of the accused's right is difficult to separate from the right of everyone in the community to attend the *voir dire* which promotes fairness.

*Id.* (emphasis added).

3.      Defendant's Right to Effective Assistance of Counsel

[¶18]   An accused is entitled to be assisted by an attorney who can adequately ensure that the accused receives a fair trial. *Laferriere v. State*, 1997 ME 169, ¶ 5, 697 A.2d 1301; *see* U.S. Const. amends. VI, XIV. An accused's right to assistance of counsel is not satisfied by virtue of the fact that "a person who happens to be a lawyer is present at trial alongside the accused." *Strickland v. Washington*, 466 U.S. 668, 685 (1984). Pertinent to the matter before us, the accused has a right to be represented by counsel who is able to focus on the proceedings and is not unduly distracted by extraneous matters.

4.      The Parties' Right to an Attentive Jury

[¶19]  The accused and the State have a right to an attentive, nondistracted jury.  *See* U.S. Const. amends. VI, XIV; *Roberts*, 2014 ME 125, ¶ 33 n.5, 103 A.3d 1031.  The ability of the jury to attend to the presentation of evidence, to the arguments of counsel, and to the instructions of the court is critical to ensuring a fair trial.  Given that the defendant's right to a fair trial is paramount, protecting the jury from distraction is a fundamental responsibility of the court.  *See Press-Enter. Co.*, 464 U.S. at 508; *Roberts*, 2014 ME 125, ¶ 33, 103 A.3d 1031; *see also Walls v. Konteh*, 490 F.3d 432, 439 (6th Cir. 2007) (noting that "concern about the jury's ability to focus on the evidence before it" is a "legitimate consideration" in the calculation of whether to grant a mistrial); *cf. State v. Hoffstadt*, 652 A.2d 93, 96 (Me. 1995) (noting that, when addressing evidentiary challenges, "[i]t is the court's duty to see that the jury is not distracted by collateral matters").

5.      Balancing the Rights

a.      Generally

[¶20]  In the matter before us, the various rights described above were in potential conflict with each other.  The spectator's presence and conduct during Frisbee's trial threatened Frisbee's right to effective counsel and placed at risk Frisbee's and the State's right to an attentive and nondistracted jury.   In

12

counterbalance, as the court recognized, excluding the individual implicated the public's right to an open trial.

[¶21] The rights of the public and the defendant to an open trial are not absolute, however, and they may be overridden by other rights or interests. *Roberts*, 2014 ME 125, ¶ 24, 103 A.3d 1031.[8] "[T]he right to an open trial may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information. Such circumstances will be rare, however, and the balance of interests must be struck with special care." *Waller v. Georgia*, 467 U.S. 39, 45 (1984); *see also Roberts*, 2014 ME 125, ¶ 24, 103 A.3d 1031. When such circumstances arise, it is within the authority of the trial judge to fashion remedies that strike a reasonable balance in ensuring that a defendant receives a fair trial. *See Roberts*, 2014 ME 125, ¶ 33, 103 A.3d 1031; Alexander, *Maine Jury Instruction Manual* § 1-3 at 1-10 (2016 ed.).

---

[8] *See, e.g.*, *United States v. Laureano-Pérez*, 797 F.3d 45, 76-78 (1st Cir. 2015) (upholding a trial court's exclusion of a defendant's wife from criminal trial proceedings because a witness had seen her "moving her lips at the witness with great distaste" (quotation marks omitted)); *Bell v. Jarvis*, 236 F.3d 149, 154, 167-75 (4th Cir. 2000) (finding no Sixth Amendment violation when a trial court closed the courtroom while the minor victim testified during a criminal trial based on over fifty-eight counts of sexual misconduct committed by the defendant against that minor victim, who was also his step-granddaughter); *Ayala v. Speckard*, 131 F.3d 62, 72-73 (2d Cir. 1997) (holding that multiple defendants' rights were not violated when the courtrooms were closed to protect various undercover officers who testified regarding undercover activities that were expected to continue in the future).

### (i)    Complete Closure

[¶22]  Because of the presumption that criminal proceedings are to be open to the public, the decision to fully close a courtroom during criminal proceedings must involve an "overriding interest," and the court must narrowly tailor the closure, both temporally and specifically.  *Waller*, 467 U.S. at 45 (quotation marks omitted).  Thus, before a trial court may fully close a courtroom during a criminal proceeding, the court must assure the following:

(1)    the party seeking to close the hearing has advanced an overriding interest that is likely to be prejudiced,

(2)    the closure is no broader than necessary to protect that interest,

(3)    reasonable alternatives to closing the proceeding have been considered, and

(4)    adequate findings have been made to support the closure.

*Id.* at 48.

### (ii)    Partial Closure

[¶23]  When a party is seeking a partial closure of the courtroom only, or when the trial court determines that a limited restriction is necessary, we will apply a less stringent standard "provided the essential purposes of the 'public trial' guarantee are served and the constitutional rights of defendants are adequately

14

protected."[9] *United States v. DeLuca*, 137 F.3d 24, 33 (1st Cir. 1998). Thus, when the closure or restriction of the public is only partial, "a 'substantial reason,' rather than an 'overriding interest,' may warrant a closure." *Id.* (citations omitted).

[¶24] The ejection of a single spectator from a courtroom, or the brief exclusion of a small group of disruptive spectators, is, at most, a partial closure. *Cf. United States v. Smith*, 426 F.3d 567, 569 (2d Cir. 2005) (holding that the requirement that court visitors show photo identification constituted "at most a partial closure"); *Massachusetts v. Ray*, 4 N.E.3d 221, 229-31 (Mass. 2014) (holding that requiring attendees to provide identification and sign in with the court officers before entering the courtroom did not constitute a partial closure). To assure a fair trial, the trial court is authorized to restrict the presence of a nonparty spectator when a substantial reason is presented, such as the potential for the distraction of a witness, the attorneys, or the jury. *See United States v. Laureano-Pérez*, 797 F.3d 45, 76-78 (1st Cir. 2015).[10] In such circumstances,

[9] Although the United States Supreme Court has not yet opined on the standard to be used in evaluating a partial closure of the courtroom, most federal circuit courts have applied a less stringent standard to partial closures than the standard for complete closures announced by the United States Supreme Court in *Waller v. Georgia*, 467 U.S. 39, 48 (1984). *See, e.g., United States v. Simmons*, 797 F.3d 409, 414 (6th Cir. 2015); *United States v. DeLuca*, 137 F.3d 24, 33 (1st Cir. 1998); *United States v. Osborne*, 68 F.3d 94, 99 (5th Cir. 1995); *United States v. Farmer*, 32 F.3d 369, 371-72 (8th Cir. 1994); *Woods v. Kuhlmann*, 977 F.2d 74, 76 (2d Cir. 1992); *Nieto v. Sullivan*, 879 F.2d 743, 753 (10th Cir. 1989); *United States v. Sherlock*, 865 F.2d 1069, 1077 (9th Cir. 1989); *Douglas v. Wainwright*, 739 F.2d 531, 533 (11th Cir. 1984).

[10] *See also Osborne*, 68 F.3d at 96-99 (upholding a trial court's partial closure of the courtroom during a trial on the defendants' kidnapping charges while the twelve-year-old victim testified); *Woods*, 977 F.2d at 76-78 (upholding a trial court's decision to exclude a defendant's family members during an

which may arise without warning and will require prompt judicial action to preserve the defendant's right to a fair trial, the court's announcement of the necessity for the limited exclusion is sufficient to create a record for review. *See id.* at 78.

b.      Balancing The Rights During Frisbee's Trial

[¶25]  In the matter before us, the court made specific findings regarding the nature and extent of the distraction presented by the spectator, and the potential for significant distraction should the spectator remain in the courtroom. Acknowledging the different interests at stake, the court made an effort to balance those interests and engaged in an escalating series of responses to the distraction. The court considered alternatives to exclusion of the spectator, such as moving the spectator to a different spot in the courtroom and having him go through security screening before entering the courtroom.    After learning more information regarding the seriousness of the potential distraction for defense counsel and juror 116, however, the court concluded that those alternatives would not be sufficient to protect the right to effective assistance of counsel and to trial before a

---

adversary witness's testimony because the court believed that the family members were intimidating the witness); *Boyd v. United States*, No. 00-612-ML, 2009 U.S. Dist. LEXIS 16690, at *5-6 (D.R.I. 2009) (reaffirming the validity of a trial court's restrictions on courtroom ingress and egress by spectators during a criminal trial based on security considerations and efforts to "limit interruptions and minimize distraction"); *New York v. Jones*, 750 N.E.2d 524, 530 (N.Y. 2001).

nondistracted jury, and the court appropriately excluded the individual. *Cf. DeLuca*, 137 F.3d at 35.

[¶26]  Because the trial court is in the best position to evaluate the nature and effect of a distraction in the courtroom, the court has broad discretion to fashion a remedy when the court has determined that a spectator is disruptive or distracting during any aspect of a trial.  The process employed here, including the entry of specific findings regarding the nature and significance of the distraction, the attempts at less restrictive alternatives to exclusion, the consultation with counsel, the voir dire of the jurors, and the additional security screening, demonstrates that substantial interests were at stake and that the court used "special care" in balancing those interests.  The court acted well within its authority when it ultimately excluded the spectator from any further proceedings and did not violate the United States or Maine Constitutions in selecting this remedy.

C.    Denial of Motion for a Mistrial

[¶27]  Focusing on his right to a nondistracted jury,[11] Frisbee argues that the actions taken by the court, even if individually constituting no error, were not sufficient to protect his right to a fair and impartial jury.  It is possible that, even when the court has taken every available step to protect the defendant's right to an

_____

[11]  Although Frisbee's brief references his counsel's distraction during jury selection, the motion for a mistrial was based entirely on jury distraction during trial.  Therefore, we do not address Frisbee's argument related to his counsel's distraction here.

impartial jury, a distraction may be so significant that a fair trial is no longer possible and the defendant would be entitled to a mistrial.

[¶28] Thus we shift our focus from the process employed by the court in addressing the spectator to the ultimate question presented by the motion for a mistrial: did Frisbee receive a fair trial? In doing so, we review the trial court's decision on whether or not to grant a mistrial under the familiar standard of abuse of discretion. *See State v. Linscott*, 416 A.2d 255, 260 (Me. 1980).

[¶29] Although the trial court has considerable discretion in deciding whether to declare a mistrial and discharge a jury, once the jury has been empaneled and jeopardy has attached, the power to declare a "mistrial ought to be used with the greatest caution under urgent circumstances, and for very plain and obvious causes."[12] *State v. Derby*, 581 A.2d 815, 817 (Me. 1990) (quotation marks omitted). If there are alternatives available to the court that will ensure a fair trial, those alternatives must be considered before an empaneled jury is discharged. *See, e.g., State v. Begin*, 2015 ME 86, ¶ 28, 120 A.3d 97. Ultimately, the decision on whether to grant a defendant's motion for a mistrial comes back to the core

---

[12] Pursuant to the double jeopardy clauses of the United States and Maine Constitutions, "once the jury is sworn and jeopardy attaches, a defendant will not be required to stand trial a second time unless he consents to a mistrial . . . or unless under all the circumstances, the mistrial was mandated by manifest necessity." *State v. Johnson*, 2014 ME 68, ¶ 10, 92 A.3d 351 (quotation marks omitted); *see* U.S. Const. amend. V ("[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb . . . ."); Me. Const. art. I, § 8 ("No person, for the same offense, shall be twice put in jeopardy of life or limb.").

18

principles of fairness and justice; the relevant question for the trial court is whether the trial court is confident that the trial can proceed to a fair and just verdict in the context of the proceedings before it.

[¶30]  We have not previously reviewed the denial of a mistrial based on allegations of juror distraction arising from third party conduct.[13]  Other courts have opined on whether a mistrial should be granted when "the jury might not be able to devote its full attention to the evidence," particularly in the wake of the September 11 attacks.[14]  *Walls*, 490 F.3d at 439.  In that context, appellate courts upheld both a trial court's grant of a motion for a mistrial in anticipation of juror distraction after the attacks, *see, e.g.*, *id.*, and a trial court's denial of a motion for a mistrial after the attacks, *see United States v. Capelton*, 350 F.3d 231, 237 (1st Cir. 2003).  In *Capelton*, the United States Court of Appeals for the First Circuit lauded the trial court for "proceed[ing] with an abundance of caution" when the trial court conducted individual voir dire of each juror, excused the one juror who indicated that "the September 11 attacks might alter his attitude toward the case," and issued

---

[13]  In *Cook*, we analyzed the denial of a motion for a mistrial due to juror distraction resulting from weather conditions, but we did so under an obvious error analysis because the issue had not been preserved for appeal.  *State v. Cook*, 2009 ME 119, ¶¶ 2, 5, 984 A.2d 1272.

[14]  On September 11, 2001, an extremist Islamic group, known as al-Qaeda, hijacked four airliners and carried out suicide attacks in the United States.  The first attack was reported just before 9:00 a.m. on a Tuesday.  The hijacked planes were flown into both towers of the World Trade Center, located in New York, New York; the Pentagon, located in Washington, D.C.; and a field near Shanksville, Pennsylvania. The attacks caused extensive loss of life and injuries.

a lengthy curative instruction to the jury. *Id.* The court concluded on appeal that because of the trial court's actions, a mistrial was not necessary. *Id.*; *see also Goehring v. Chapman Univ.*, 17 Cal. Rptr. 3d 39, 55 (Cal. Ct. App. 2004) (affirming the denial of a motion for a new trial when the jurors all answered in the negative when asked if they would be distracted after the September 11 attacks).

[¶31]  As the above cases demonstrate, whether a trial court should grant a motion for a mistrial due to allegations of juror distraction is a highly fact-specific question. When the trial judge succeeds in removing or curing the distraction, a mistrial may not be necessary. *Cf. Begin*, 2015 ME 86, ¶ 28, 120 A.3d 97.

[¶32]  Here, the court's prompt actions limited the exposure of the jurors to the distracting spectator to a very brief amount of time. The court ordered a recess as soon as it was notified of the spectator's presence in the courtroom on the first day of trial. It then voir dired juror 116, who reported that she was distracted only for the brief period of time when the spectator was in the courtroom and that her distraction ended when the spectator was removed. On the morning of the second day, after the spectator had been in the presence of some of the jurors before the trial resumed, the court interviewed all of the jurors individually and found that only one juror had been distracted and all jurors could remain impartial.

[¶33]  The trial court is in the best position to gauge the jury's response to a possible distraction. *Cf. Johnson v. Carleton*, 2001 ME 12, ¶ 10, 765 A.2d 571.

Nothing in the record indicates that the court's assessment of the spectator's effect on the jury was inaccurate. To the extent that a juror may have been briefly distracted by the spectator or his activities in the courthouse, the court's voir dire confirmed that the spectator in no way affected the ability of that juror to be fair and impartial. The brief distraction of a single juror does not rise to the level of extremely prejudicial circumstances that would require us to vacate the trial court's discretionary denial of a motion for a mistrial. *Cf. State v. Krieger*, 2002 ME 139, ¶¶ 13-16, 803 A.2d 1026; *Ardolino*, 1997 ME 141, ¶ 18, 697 A.2d 73. We are not persuaded that Frisbee was deprived of a fair trial, and the trial court did not abuse its discretion in denying the motion for a mistrial.

The entry is:

Judgment affirmed.

---

**On the briefs:**

Arnold S. Clark, Esq., Fletcher Mahar & Clark, Calais, for appellant Kenneth Frisbee

Mathew Foster, District Attorney, and Ethan Plaut, Asst. Dist. Atty., Prosecutorial District VII, Ellsworth, for appellee State of Maine

**At oral argument:**

Arnold S. Clark, Esq., for appellant Kenneth Frisbee

Ethan Plaut, Asst. Dist. Atty., for appellee State of Maine

Washington County Superior Court docket number CR-2013-44
FOR CLERK REFERENCE ONLY